```
UNITED STATES DISTRICT COURT        FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| CHARLES VICTOR,<br><br>         Petitioner,<br><br>   - versus -<br><br>UNITED STATES OF AMERICA,<br><br>         Responent. | MEMORANDUM<br>AND ORDER<br>11-CV-1679 |

A P P E A R A N C E S:

  CHARLES VICTOR
    FCI Victorville Medium I
    P.O. Box 5300
    Adelanto, California 92301
    *Pro Se Petitioner*


  LORETTA E. LYNCH
    United States Attorney
    Eastern District of New York
    271 Cadman Plaza East
    Brooklyn, New York 11201
  By: Matthew S. Amatruda
    Rachel J. Nash
    *Attorneys for Respondents*


JOHN GLEESON, United States District Judge:

    On June 24, 2009, Charles Victor was convicted after a jury trial of possession of ammunition and body armor by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 931(a). He was sentenced on November 20, 2009, principally to a nine-year prison term. His conviction and sentence were affirmed on September 29, 2010. *United States v. Victor*, 394 Fed. App'x 747 (2d Cir. 2010).

    Victor now seeks relief from his conviction and sentence pursuant to 28 U.S.C.

§ 2255 on the ground that he received ineffective assistance of trial and appellate counsel. For the reasons set forth below, Victor's arguments have no merit, and his application for relief is denied.

BACKGROUND

At 9:00 in the evening of January 21, 2009, a snowy winter night, the police responded to an emergency call by going to 189 York Street in Brooklyn. The genesis of the call was the decision by Victor, who resided in the first floor of that address, to warm his pillows in the oven. Others lived in the building, and they understandably thought this was a bad idea and quite dangerous. When they confronted Victor with their objections, he reacted by threatening them with a firearm. That induced them to call 911.

When the police arrived they entered the house, a multi-story residence, through a shared entryway. They encountered four agitated people, including Victor, who were arguing in loud voices and gesticulating wildly. Two witnesses reported that they had argued with Victor (who was promptly surrounded by police officers) and that he had threatened them with a firearm he had retrieved from the backyard. The premises were so poorly lit that the police needed flashlights to see their way around. Pit bulls were heard growling and whining elsewhere in the building. To ensure that everyone in the building was accounted for, the police conducted a brief protective sweep of the first floor of the premises and in doing so observed a bulletproof vest protruding from a hall closet.

After the protective sweep, the police continued interviewing the witnesses, though they moved upstairs away from Victor, who remained on the first floor. The witnesses described Victor's insistence on warming his pillows in the oven and their objections, and they

2

said Victor had run into the backyard of the home, returning with a weapon that he menaced them with. They said he had returned the firearm to the backyard before the police arrived. Two of the complaining witnesses were the landlords of the premises, and they consented to a search of the common areas of the building and the backyard.

Concerned about a possible ongoing fire hazard in the first-floor kitchen, the police returned there to make sure there were no pillows in Victor's oven. They proceeded directly (and only) to the kitchen. On their way they once again saw the bulletproof vest and also observed bullets in plain view in another room.

Finally, the police went out to the backyard, where they recovered a rifle from under a tarp at the end of a trail of footsteps that had been left in the snow. After finding the firearm, the police arrested Victor. The next day, based in substantial part on the observations they had made of the bulletproof vest and ammunition, they obtained and executed a search warrant for the basement and first floor of the premises, seizing bulletproof vests, a loaded high-capacity magazine, and about 60 rounds of different kinds of ammunition in various locations on the first floor of the house.

Trial counsel moved to suppress the various items seized pursuant to the search warrant. The arguments concerned the scope of the warrant and whether it satisfied the particularity requirements with respect to the places to be searched and the items to be seized. The motion was denied after an evidentiary hearing. I found there was no Fourth Amendment violation prior to the issuance of the warrant because it was lawful for the police to conduct the protective sweep upon their initial entry and to later check the oven to ensure there was no fire hazard. I also rejected the arguments directed at the provisions in the warrant and the execution of the search.

On June 24, 2009, after a jury trial, Victor was found guilty of Counts Two and Three of the indictment, which charged him with possessing the ammunition (Count Two) and the body armor (Count Three) recovered from the house while in the status of convicted felon, in violation of 18 U.S.C. §§ 922(g) and 931(a). However, the jury acquitted Victor of Count One, which charged that he had unlawfully possessed the firearm recovered from under the tarp in the backyard.

Victor appealed his convictions and sentence to the United States Court of Appeals for the Second Circuit. Represented on appeal by the same lawyer who represented him at trial, Victor contended that the motion to suppress evidence seized from his home had been erroneously denied. The Second Circuit disagreed and affirmed. *Id.*

Proceeding *pro se* here, Victor contends that he received ineffective assistance of counsel both in the trial court and on appeal. Specifically, Victor claims that counsel should have made different arguments in support of the motion to suppress evidence and failed to present mitigating evidence of Victor's mental illness at trial or at sentencing.

Oral argument, at which Victor appeared via videoconference, was held on August 23, 2011. On that date I directed the government to convey my request to Victor's counsel that he respond to the claim of ineffectiveness, and he did so in an affirmation dated September 6, 2011 (Docket entry #6).

DISCUSSION

A.  *The Applicable Legal Standard*

Victor claims that he received ineffective assistance of counsel both at trial and on appeal. The Supreme Court established the following standard for claims of ineffective assistance in *Strickland v. Washington*:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. 668, 687 (1984). Thus, to make out this type of claim Victor must demonstrate both that his attorney's performance "fell below an objective standard of reasonableness," *id.* at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

In assessing whether counsel's performance was deficient, judicial scrutiny "must be highly deferential," and the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted); *accord Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998); *see also Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (per curiam) ("[C]ounsel has wide latitude in deciding how best to represent a client . . . ."). The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct," *Wiggins v. Smith*, 539 U.S. 510, 521 (2003), instead emphasizing that "'[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms,'" *id.* (quoting *Strickland*, 466 U.S. at 688), which requires "a context-dependent consideration of the

5

challenged conduct as seen 'from counsel's perspective at the time,'" *id.* at 523 (quoting *Strickland*, 466 U.S. at 689).

To establish the required "reasonable probability" that counsel's errors changed the outcome of the case, Victor must show not just "some conceivable effect" on but rather "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 693-94. This determination, unlike the determination of whether counsel's performance was deficient, may be made with the benefit of hindsight. *Lockhart v. Fretwell*, 506 U.S. 364, 371-73 (1993).

The same test applies to claims regarding the performance of appellate counsel. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) ("The proper standard for evaluating [a] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland v. Washington*."); *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994). Appellate counsel need not present every nonfrivolous argument that could be made. *See Mayo*, 13 F.3d at 533 (citing *Jones v. Barnes,* 463 U.S. 745, 754 (1983)). Moreover, a reviewing court should not employ hindsight to second-guess an appellate attorney's strategy choices any more than it may do so in evaluating the performance of trial counsel. *See id.* (citing *Fretwell*, 506 U.S. at 371). A petitioner, however, may establish constitutionally inadequate performance if he shows that his appellate counsel omitted material and obvious issues while pursuing matters that were patently and significantly weaker. *Cf. Jackson*, 162 F.3d at 85 ("[R]elief may be warranted when a decision by counsel cannot be justified as a result of some kind of plausible trial strategy.").

B.  *Application of the Standard to This Case*

Victor argues that in seeking to suppress the evidence seized from his home, his counsel should have relied on *Georgia v. Randolph*, 547 U.S. 103 (2006). *Randolph* involved a consent search. The defendant's wife had called the police and reported that her husband had

6

taken their son away after a domestic dispute. When the police arrived, she told them her husband was using drugs. The husband arrived a little later and the police asked for his consent to search the house, which he denied. They then asked the wife for consent, which she gave, and they searched the home. The Supreme Court held that the search was unreasonable as to the husband because "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Id.* at 122-23.

Presumably, Victor contends that under *Randolph*, the warrantless entries of his first-floor residence on the night of January 21 were unlawful because he expressly refused consent to those entries. Under this argument, the improper entries tainted the search warrant obtained the next day and the items seized pursuant to that warrant should have been suppressed. I conclude that because the warrantless searches were lawful irrespective of whether the police had proper consent to undertake them, Victor's counsel did not act deficiently in failing to rely on *Randolph*.

No one disputes that the police had probable cause to make the warrantless entries into Victor's residence. Rather, the question here is whether an exception to the warrant requirement applies to render those searches reasonable. I concluded at the time, and continue to believe now, that the first warrantless entry into Victor's living quarters was reasonable because it was a proper protective sweep. *See United States v. Miller*, 430 F.3d 93 (2d Cir. 2005). A protective sweep of someone's home is permissible when an officer who is lawfully present in the home "possesses 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the . . . scene.'" *United States v. Miller*, 430 F.3d 93, 98 (2d Cir. 2005) (quoting *Maryland v. Buie*, 494 U.S. 325, 334 (1990)) (alterations in

7

original). In this case then, the police needed reasonable suspicion to believe that someone on the first floor of the premises, where they searched, posed a danger.

Recognizing that this case presents a close call, as the only dangerous individual (Victor) had been subdued before the police conducted the protective sweep, I nonetheless conclude that the police's behavior was justified. Lawfully present in Victor's home to address a threat of violence, the police had reasonable suspicion that someone dangerous might be on the premises, and that suspicion did not dissipate the instant they surrounded Victor. In the entryway the police found a highly volatile situation. The house was poorly lit, dogs were growling, and several people in the entryway were talking loudly and gesticulating wildly. Although the police soon surrounded Victor, thereby immobilizing the only actual safety threat, they were permitted to immediately conduct a brief protective sweep to ensure that no one else was on the first floor. While the police might have ascertained that the sole threat of danger had already been neutralized had they first spoken to all of the people in the entryway, they were not compelled to exhaustively interview everyone before undertaking the protective sweep to conclusively ensure everyone's safety.

In any event, even if the bounds of the protective sweep doctrine were surpassed in this case, the police's second warrantless entry in Victor's residence was clearly lawful in light of the exigent circumstances confronting them. The police ultimately learned that pillows might still be in Victor's oven and, to protect themselves and others from an imminently dangerous situation, were justified in entering Victor's residence without a warrant to turn off the oven and/or remove any pillows still there. *Cf. Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006) ("One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with injury."); *United States v. Klump*, 536 F.3d 113, 117-19 (2d

Cir. 2008) (holding it was lawful for firefighters to undertake warrantless search of building when they had reasonable basis for believing there was fire inside). Because the information the police gathered from the first warrantless search would inevitably have been discovered in the lawful second one, the warrant obtained in reliance upon this information was not tainted. *See Nix v. Williams*, 467 U.S. 431 (1984). Counsel did not fail Victor by failing to make a losing argument.

As for Victor's mental condition, it could not have supported a viable defense at trial, but his attorney in fact sought leniency at sentencing on that ground. His affirmation reveals that he fully informed himself of the relevant facts and handled the issue thoughtfully. Given my express reference to Victor's mental health issues in imposing a sentence below the applicable range, it appears that counsel handled the issue effectively as well. In any event, there is no basis for second-guessing his judgment here.

## CONCLUSION

Because his claims have no merit, Victor's application is denied and no certificate of appealability shall issue.

So ordered.

John Gleeson, U.S.D.J.

Dated: November 18, 2011
      Brooklyn, New York